Good morning. May it please the court. My name is Jill Bolton. I'm an assistant U.S. attorney with the U.S. Attorney's Office in Yakima in the Eastern District of Washington. This is a government appeal of a district court order suppressing evidence, defendant statements and the actual evidence of firearm in this case that was retrieved as a result of that, those statements. The issue before the court is whether or not the encounter between law enforcement and the defendant in this case was a custodial interrogation. I don't think that either side disputes that there were questions asked and that questions tended to incriminate the defendant and therefore it was an interrogation. Can you tell us exactly what the physical circumstances were? Was the government trying to park the car, park in a way that they couldn't move the truck? Your Honor, that's, I think, somewhat in dispute. The district court found that, in fact, the Fish and Wildlife officers blocked or parked their car in a manner that blocked the defendant from egress, from the location on the mudflats where he was parked. The defense witness that testified, the defendant's friend who was present at the scene during this encounter, said, no, the trail continued on. If you had just continued on in their truck, they would have gotten to the other side of the trail that was on the other side of the mudflats. So the issue on that issue, yes. The issue at the district court judge probably made the right call on that, or at least it's not one that we can find to be clearly erroneous. Well, certainly that's a difficult burden for the government to overcome, and I don't The facts are what they are, and what the government would submit is that it doesn't make a difference. The nature of this encounter was very similar to a traffic-type stop. When a motorist is stopped on a roadway, for example, for speeding, they're confronted almost immediately with evidence that they have committed some kind of traffic infraction, which is the same as what happened here when the officers, the two uniformed officers approached the defendant and his friends who were standing out around their vehicles. They're also not – our case law is very confusing on this, but they're not – in that circumstance, which is essentially the Berkmer circumstances, they were not – they're not free to leave, right? Right. If you start somebody in a traffic violation, you say, stay here, I'm going to go check your warrants. If the guy takes off, he's got a problem. Right. A person would understand when it's stopped for a traffic stop on the roadway, you can't just take off and ignore the officer's command to stop. They've just pulled you over. And you'd also understand that you can't really leave your car on the roadway and just walk away in the middle of a public highway. But even if you could, you see, the part that I got sidetracked on is, I'm not sure exactly why it matters whether the car was blocked or it wasn't blocked if the person is legally detained in either event. In other words, if they're not allowed to leave because it's understood that they are under orders to stay there, I'm not sure if it matters whether the person is legally detained or not. The government would agree with that. The encounter in this case and the circumstances are that it was a friendly encounter with law enforcement. The interrogation itself really amounted to about two questions. But they were there for a half hour, 40 minutes. That's true. I mean, am I right that Berkmer is kind of the case that this is taking off from? Yes. All right. And in Berkmer, they were stressing that it was a traffic stop and it was very brief. This wasn't a traffic stop and it wasn't all that brief. Now, do those things matter? Your Honor, I think you have to look at the circumstances of the encounter. When the officers approached the defendant and his friends, they immediately advised them, look, you guys shouldn't be out here on the mudflats. You're parked illegally. So what does a reasonable person then understand the encounter to entail? Certainly, they don't expect that they're going to be arrested and handcuffed and dragged down to the police station for having parked illegally. But on the other hand, the questions which were asked are seeking incriminating evidence. Well, true. When the officer approached the defendant's car and saw what appeared to be a box that was labeled as an ammunition box, the officer immediately thought, okay, there may be a firearm here. This is a wildlife refuge. It's not hunting season. That would be illegal. And he asked, whose car is this? That was the first question. The defendant admitted it was his. And then he said, do you have a gun? The defendant said, no, just a .22. And the officer knew then that he had a .22 long rifle that matched, of course, the ammunition box he had seen in the car way. Certainly, those were intended to elicit incriminating responses. The issue is whether or not the defendant in those ---- Originally, I guess this, in essence, was a traffic stop. It was similar to that. There was no flashing of lights or pulling over vehicles. The defendant was already parked. But they were stopped because of traffic violation, i.e., they were parked in the wrong place. Right. All right. Go ahead. So the circumstances were friendly. The defendant's own witness that took the witness stand said it was a friendly encounter. There was no commands. There was no drawing of weapons. And the officer who testified said he was explaining to the encounter, not isolated and just surrounded by two law enforcement officers. The officers were informing them of the situation and how it really impacted wildlife to be parking in that area. So it was a friendly educational encounter. I think we would all have to understand that they were not afraid to leave at that moment. Right. And I think what they all understood was that the officers were there telling them about how they shouldn't park there. And that was a testimony that was elicited from the defendant's own friend that was there with him. The defendant didn't testify at the suppression hearing. But so the question is, would a reasonable person, having been informed by law enforcement that you can't park in this particular area, expect that you're going to be detained and probably arrested and taken down to the police station? And those circumstances just don't exist in this case. And, therefore, the situation of custody where Miranda is implicated just did not exist in this case. The factors this Court has identified. What we're saying, then, is that even though you're not free to leave, you're not in custody. This is one of the kind of conundrums in our cases, but that's what you're saying to us. Well, I don't think that this case presents a situation where they were not free to leave. The facts demonstrate that they were. But they were. This is the way I see the case. They weren't free to leave, leaving the car aside. The people came up to them. They were investigating. They were doing essentially a terror investigation of a possible crime, i.e., parking on the  And I think it's not realistic to say, just as it isn't in the case of a traffic stop, that if they just decided to turn the other way and walk off, they weren't in some form of detention. They may not have been in Miranda custody, but they were seized in the short run, weren't they?  Okay. They were detained. Detained means not free to leave in a legal sense. If they leave, they're defying an order and presumably the police could go after them and bring them back because they're seized. True. But nothing about the encounter would have led a reasonable person to believe they couldn't take off and walk back to town. It was a quarter of a mile to town. Those things are totally inconsistent. You just agreed with me that if they had taken off and walked back to town, the police would have gone after them and said, wait a minute, we are detained. Well, it's – this situation is different, really, in a sense, from a true traffic stop. But isn't it what Kramer was assuming, that those people were detained? There was a traffic stop. They were not free to leave in that sense, but they weren't in Miranda custody. And the question before us is, what's the line between detained for Terry purposes and subject to Miranda because the custody is of the kind that is sufficiently possibly coercive to demand Miranda warnings? Am I missing something here? Well, it seems that this case is somewhat different than a traffic stop. I said it's analogous. No, I understand that. But it is different. The point is that being free to leave or not free to leave can't be the line because in a traffic stop, they're not free to leave. True. Some of them are. And I think the legal – the legal rule that this Court has announced is that whether there was a restraint on the freedom of movement to a degree associated with a formal arrest, and that didn't exist here, none of the individuals at that scene, and the defendant in particular, would have felt that they were restrained and were going to be arrested for having parked illegally, just as a person who is detained at a traffic stop would not have that impression. Your Honor, for those reasons, we would submit to the Court that the district court decision suppressing the evidence in this case and finding that there was a custodial interrogation should be reversed. Thank you. We'll give you a minute, Roberto. Good morning, judges. I am here on behalf of Trevor St. Germain to ask you to uphold Judge Shea's decision when he suppressed the evidence in this case. And what J – excuse me – what Judge Shea had in front of him in regards to Judge Fletcher's question about a clear and convincing error of how a judge would view the facts, an event that the government doesn't even fess up to in this particular case. They never alleged that Judge Shea did anything wrong with the facts, meaning why are we here if Judge Shea didn't do anything wrong? He was the one of the determiner of the facts. But Judge Shea also had in front of him, as you can see from the record, a lengthy video, and it was between 5 and 10 minutes long, of this area that we're talking about. Is that video in the record before us? It is in – I tried to find it. The way we read your rules, we thought you didn't want the video, but we did send a video to the court, but there is a video that Judge Shea had, and it's a part of the evidence of this case. I wouldn't – I can provide it. But Judge Shea saw how remote this location was. It doesn't make any difference to say that, as the government does, well, these people could walk back to town. They were out in the middle of nowhere. It's a wildlife refuge. There are not paved roads. Right. I really have a problem. Suppose they were driving down the road in the same area, okay, and they were speeding. And the police came up to them and put on their lights and stopped them, i.e., seized them, right? Right. And said, you know, looks to me like you were speeding, and give me your license, and went off and checked their warrants. Now, whether they were blocked or weren't blocked, and whether they were in a remote area or weren't in a remote area, they were not free to leave. The Berkemer case, which I think the government has proposed to this honorable court, is distinguished from the facts that Judge Shea had in front of him. In Berkemer, those people are on a public highway. And they even talk about that in the Berkemer decision of people passing by to see what is going on between the police and the individual. Also, when a person in the state of Washington where this event occurred is stopped for speeding, as in the rest of the United States, it's a civil infraction. It's not even a crime. The young Trevor and his friends, they were in a very remote location. If you would yell for help, no one would hear you. No traffic goes by there. The paths that you drive on cannot be called roads because they're just sandy trails. The area of this mudflat is next to the river. Nobody would hear you. It's a very remote location. And I think the court can use the difference of the Berkemer situation where a person is essentially in public with the safety, and they talk about that, the safety of being in public, versus these young people, all teenagers, two young men and two very young women, cousins of Trevor and high school buddy of Trevor. They're out in a very isolated, very unprotected area. There is no public to see what is going on between the police. And the first thing that the police do, I believe it was Officer Pellaquin or the one that's in training that Judge Shea referred to, the one that was in training, he starts lecturing them about it being a crime or they're Briggs Park. And Was it a violation of the regulations? Yes. All right. Assuming that, for the sake of argument, that Mr. Germain was temporarily seized, didn't the parking on the mudflat, which was a violation of the regulations, constitute reasonable suspicion to briefly detain him? Yes. But then the next issue is that the police officer separates according to the facts that you have in front of you and the excerpts of record that you have in front of you. The police officer separated the group into two separate groups. There were two police officers, and one of the police officers went to Trevor's rig, which was open. Now, he's already told Trevor of one criminal violation, and the second thing he does is ask, who is this box of 22 cartridges belong to? Now, a box of 22 cartridges is the second crime. Did he ask that, or did he ask who the truck belonged to? He first asked who the truck belonged to. Trevor owned up to the truck, and then he said, whose box of 22 bullets are these? And it was a cartridge box. The testimony also shows the officer never looked at it, I mean, looked inside of it to see whether it was used for some other purpose. So we don't know what was in the box and it wasn't in front of Judge Shea. The next question, as Ms. Bolton alluded to, is immediately we have a criminal activity on the mudflats. The 22 bullets, this was a closed-season hunting, so that's a criminal activity. And now all of a sudden the officer asks the third incriminating situation in regards to do you have a weapon. No Miranda was ever given. All right, let me back you up a minute. Sure. Once he saw the box of ammunition, then that does not constitute reasonable suspicion for a further brief detention. If I could, I beg to differ from you, and respectfully so, and you know that. The officer never looked inside of it. He didn't have to. He could look in the window and see the box of ammunition. The point being is that we don't know whether it contains something illegal. The officer just assumed that it did. It doesn't matter whether it was empty or not. He saw the box of ammunition, a box, which potentially could or could not obtain ammunition. Then he said, do you have a weapon? Without hunting season, it's a violation to have a weapon on that park because it wasn't hunting season. He just asked the question, do you have a weapon? Mr. Germain said yes. There's a rifle in the truck, didn't he? He said no, just a .22. Just a .22. Yeah. All right. Well, now, my scenario is that even for sake of argument, if there was a brief detention, a brief seizure because of parking on the mudflats, then observing the box of ammunition, did it not justify another brief detention or continuation of the detention for the inquiry about that? And then once the weapon was discovered by the admission, then they had probable cause to make the arrest. But at what point is the court willing to allow all these little death by a thousand cuts before all of a sudden we say, oh, well, the Miranda rights should have been given? The officer ordered Trevor to retrieve the gun because the officer couldn't find it in his rig. It wasn't visible. And all of a sudden we have a search by an officer going into a rig without a search warrant, without benefit of Miranda. Wait a minute. I thought you said Mr. St. Germain retrieved the weapon. He did. He was ordered by the officer to retrieve the weapon without benefit of saying, with the Miranda benefits, that maybe Mr. St. Germain, you should be quiet now, and that's what our Constitution requires, and that's what I ask this Court to find. There are, in the case. If he had arrested him at that point. Well, of course, Trevor wasn't free to go, so we argue that he was arrested at that point. See, but that's where the problem is, because our case law is so bizarre about this. He wasn't. When we have some, there is certainly a category of detentions which is not an arrest, right? In fact, it's very broad, bizarrely broad. I mean, we have people who are in handcuffs for a half hour and they're not under arrest. They're Terry stopped. This Court, the Ninth Circuit, has a five-tier level of whether you're in custody or not, and this Court has announced it in the Hayden case and in the, I don't know how to pronounce the name, Beran Perez. I may be mispronouncing it. But those five things, just real quickly in the short remaining time, are the language used to summon the individual, the extent of which the defendant is confronted with evidence of guilt, who's 22s, is there a gun in there, it's illegal to be parked on the mudflats, the physical surroundings of the interrogation. Clearly, if the Court looks at the video, this is a very remote situation. We have two young people who can easily be intimidated because of the remoteness. The duration of the detention, the government wants the Court to believe that this was just a short, a little conversation between Officer Pelequin and Trevor. In fact, it wasn't. It almost lasted 40 minutes. And that's not a short. At the time of the, that's another problem. At the time that the query was made that resulted in the statement that you're trying to suppress, that was very short, wasn't it? It was about halfway through the first instance that a client or a defendant would think that they're about to be arrested is the lecture by the game officers, the Rangers, about the illegality of where they were parked. And it wasn't an infraction. It's a criminal matter. And you will note that the officer even goes on to say, and the reason it's illegal because of nesting birds and on. That took some time. My time's out. I'd like to finish this. If you look at the five factors in Hayden and Perez, I believe that Judge Shea correctly applied those five factors to this case, realizing that the government does not contend that any of his assertions of facts that he found has any error to it. I ask this Court to uphold his decision. Thank you very much. Thank you. I thank counsel for useful arguments in United States v. St. Germain. Go on to United States v. Cruz there.
judges: B. Fletcher, Hamilton , Berzon